## SHALER W. ELDRIDGE *vs.* GEORGE W. BENSON & Trustees.

S. agreed with B. to furnish such good and responsible persons, as B. should desig nate to act as agents for the sale of certain books, with the said books, at a cer- tain price, supplying their orders, and receiving their remittances, and placing all money so received, above the amount of the price agreed upon, to the credit of B., and, at the close of the labors of such agents, to receive all the books re- turned by them uninjured, and credit the same, at the cost price, to B.; and B., on his part, guarantied to S.· the security and full payment of the stipulated price for all books so furnished. It was held, that the contract between S. and B. was that of principal and agent, and not that of vendor and purchaser, and that books, furnished under this contract to the agents designated by B., did not become B.'s property.

THE several trustees in this case having made answers, whereby it appeared that they had in their possession several sets of books known as " Sears's Pictorial Works," Robert Sears, of New York, upon application to the court, was admitted as a party to the cause, and claimed the said books as his own property. The only question submitted to the jury at the trial, which was in the court of common pleas, before *Hoar*, J., was whether, at the time of the service of the writ on the trustees, these books were the property of Sears, or of the plaintiff. Sears contended that the books in question

were delivered to the trustees, as agents accountable and responsible to him, and that they received the same to sell, and make remittances to him; and in support of this claim, he offered in evidence a contract in writing between himself and Benson, under which the books were delivered, of which the following is a copy:

" The following agreement between Robert Sears, of the city of New York, on the one part, and George W. Benson, of Northampton, Mass., of the other part, witnesseth: That the said Robert Sears, the party of the first part, agrees to furnish such good and responsible persons, as the said George W. Benson, the party of the second part, may designate or elect to act as agents for the sale of Sears's Pictorial School Library, with said works at $13.50 per set of twelve volumes, to said Benson, supplying their orders and receiving their remittances, and placing all money so received above the amount of $13.50 as above specified, to the credit of said Benson, and at the close of the labors of the said agents, to receive all the books returned by them uninjured, and credit the same to said Benson, at the cost price above specified; and the said George W. Benson, the party of the second part, hereby guarantied to said Robert Sears, the security and full payment of the above named price of $13.50 per set of twelve volumes of the aforesaid work as may be delivered to all such persons as he, Benson, may appoint as agents, and to whom he may direct said books to be sent. It is further agreed between said parties, that settlements shall be made quarterly for all bills contracted by said Benson on his account."

The plaintiff contended that the books delivered under this contract became the property of Benson, and the construction of the contract was the only question submitted to the court. The judge ruled, that under this contract, the books still remained the property of Sears; and under this ruling, the jury found a verdict for him; whereupon the plaintiff excepted.

*C. Delano,* for the plaintiff.

*C. P. Huntington,* for Sears.

BIGELOW, J. This cause was tried in the court of common pleas, upon an issue framed under Rev. Sts. *c.* 109, §§ 16, 17, 18, between the plaintiff and one Robert Sears, who claimed the property in the hands of the supposed trustees, as belonging to him. The right of the claimant to the property depends entirely upon the true construction of a written contract between him and the defendant, and it is the construction put upon this contract by the court below, to which exceptions have been taken, upon which we are now to pass.

The contract is inartificially and obscurely drawn, and it is

somewhat difficult to ascertain the precise purport of all its stipulations; but, upon a careful consideration of its several provisions, we are of the opinion that it created between the parties the relation of principal and agent, and not that of vendor and vendee. The leading feature of the agreement, which of itself would be quite sufficient to determine its meaning, is the right reserved to the defendant to return such portion of the books, delivered to him under the contract, as might not be disposed of by the agents. Such a stipulation is wholly inconsistent with an absolute sale of the property to the defendant, and clearly indicates the intent of the parties to have been, that the right of property should remain in the claimant. The elementary definition of a sale is the transmutation of property from one man to another; but no such change takes place, when it is agreed between parties that property may be returned to the person from whom it was received. To test and illustrate the correctness of this principle, as applicable to the case at bar, let us suppose all the agents to have been unsuccessful in disposing of the books, and, at the close of their efforts to sell the work, to have had on their hands all which they originally received from the claimant. By the terms of the contract, the defendant would have the right to return to the claimant all of the books which had been received. By construing this contract therefore as a contract of sale, by which the property became vested in the defendant, we should be led to the necessary but absurd conclusion, that a vendee to whom the absolute right of property had passed could still retain the right of returning it to his vendor.

But there is another consideration of equal force, arising out of the provisions of this contract, which is quite decisive of the intent of the parties, and of its true construction. The contract provides that the defendant should select certain persons as agents for the sale of the books named in the agreement. But these agents were to have the right to order the books, and receive them directly from the claimant, and were to remit the proceeds of their sales to him, without the intervention of the defendant. Now, if the right of property vested

41*

in the defendant, upon the delivery to the agents, his creditors could attach the books in the hands of the agents, and take them from their possession, by the ordinary process of law; the ·effect of which would be, to defeat the most important stipulations in the agreement. The agents could then no longer remit the proceeds of their sales to the claimant, nor account to him for the books which they had received on their own orders; nor could the defendant or the agents return any part of the property to the claimant, in conformity with that part of the agreement. We think, therefore, the real intent of the parties was, that Benson was to select persons to act as agents for the sale of the books; that these persons were to be agents for the claimant, to whom he was to send books for sale on their own orders, for which they, and they only, were to account to him; that the defendant was to guaranty their fidelity and solvency; and to receive from the claimant, as a fund out of which to compensate himself and the agents, all that was received in remittances from sales, over and above the stipulated price. This very fact, that Benson was to guaranty " the security and full payment " by the agents to the claimant, is significant to show, that the books were not sold to the defendant; but were delivered to the persons selected by him, as agents of the claimant, and who were to be accountable to him. A guaranty by the defendant to the claimant implies a liability on the part of the agents to the claimant, because there can be no guaranty, unless there is a promise or agreement to which it may be applied. If the books were sold to the defendant absolutely, the agents would be liable only to him, and not to the claimant.

It was urged, by the counsel for the plaintiff, that the provision in the contract, which stipulates that the books returned should be credited to the defendant, indicates that it was the intention to charge the books as absolutely sold to him. But it seems to us more reasonable and consistent with the other parts of the agreement to hold that the account to be kept with the defendant was only intended to show the extent of his liability under the guaranty, for the agents. As he was to be responsible for them, it would be necessary to

charge him with the books delivered to the agents, and credit him with those returned, in order to ascertain the extent of his liability as guarantor. But it is to be observed, in this connection, that the contract does not provide that the entire proceeds of sales by the agents were to be credited to Benson, as it should have done, if the books were charged to him as sold; but it is expressly stipulated, that he is to be credited only with the amount remitted by the agents, over and above the price at which they were to be furnished to the agents; clearly showing, that he was not charged with the price of the books, and did not therefore become the owner. The agreement for quarterly settlements does not affect the view which we take of this contract. To arrive at its true construction, all its parts must be construed together. The right to return the books was limited only by the expiration of the term of service of the agents, and not by the time limited for the settlements, which were only to include the books which had been sold or returned, at the time each settlement should take place.

From these views, it seems to us very clear that the contract in question was not a contract of sale, but one of agency only; that no title to the books vested in the defendant; that the books in the hands of the agents, and attached by the trustee process, are still the property of the claimant; and that the trustees must be discharged. See *Meldrum* v. *Snow*, 9 Pick. 441.